Good morning. Jerome Mooney on behalf of New Amsterdam Foundation. May it please the Court. This is a case in which the appellant, my client, was initially swindled out of $10 million by individuals who are not parties to the incident action. Subsequent to that, their money, their $10 million, ends up being converted into the hands of other individuals. When did they realize they were swindled? They don't realize that they've been swindled until sometime in 2003. Between 2001, between July 19th of 2001 and the spring of 2003, the original culprits, if you will, engage in an active campaign of lulling. One of the lulling documents becomes significant in the case later on because it is a purported wire transfer of $29 million into a trust account that's been created for the benefit of the swindlers. Let me tell you the problem I have with the case, and you tell me where I've missed the boat. Sure. They knew in 2003 that they had been swindled. That's correct. They didn't wind up suing the current defendant until 2007, which is beyond the statute of limitations. You say that they're excused from that because of the fraudulent concealment. That's correct. And I think it's important to remember that their cause of action against the defendants in this case is a different cause of action than the cause of action against Margaret Laughlin, Holland, all of the people involved in the original swindling. Right. My point was they knew in 2003 that they had been swindled, and they knew it was by these other people. That's correct. I have – I'm looking at this case. It's Snap and Associates v. Malcolm Bruce. And it says, My question is, they know they were swindled, at least by somebody else. Aren't they then obligated to try to find at that point who's the someone else, which they could have done by subpoenaing the bank records and other things? And they did find out who those people were. The people who swindled them. Yes.    I mean, they could have gotten it from the mother to the defendant here, couldn't they? Well, apparently it wasn't that easy to do. Well, they could have gotten it from the bank. I think it's not that easy to do, but it's very odd to me that you sue Connolly, then you add people to that lawsuit. That's correct. But you don't get the bank records? Is that right? For some reason, they were – I mean, I don't mean you, but – I understand. The trace of this thing. And what I understand is that they were unable to get those bank records. It's not that they just didn't get them. They just were unable to get records. But where does it say that in the – I mean – And I don't have anything – If there were a transcript thing that said, look, we actually tried to get the records. The bank stonewalled us. We couldn't get the records. And we say, oh, that's a problem. Yeah. But we don't have that. We don't have that. We have this whole lawsuit. And what we're talking about here is money. And usually when somebody takes your money, what you do is you trace it. And first you trace it to where it went, which is the bank account. And then you get the mother's bank records. And then you would have seen potentially this transfer. So that's where I – maybe I'm having the same problem, Judge Silverman, is I kind of come to a standstill when I see that in 2003 they knew the money had flown the coop, but they didn't go to the most obvious place to get it, which was the bank. Well, apparently by that point in time, by the time they found out about it and started trying to trace things down, they had – they were unable to do it. I know the difficulties that we had after I came into the case. So we don't have any record about that. We don't. See, it seems to me that's where you would also – that might be – you know, there may be an exception in terms of tolling if you're unable to obtain information and therefore you're not put on basically constructive notice of it. But if we don't have that, what's your best argument for why jump forward and let them file suit? What we do have is the statement, the declaration of Hedinolte, who was one of the – part of the second group of lawyers that were involved in this and the ones that filed this action originally. And they're saying that they were not able, through the efforts – and it doesn't say exactly how this is – they were not able to obtain the information about these transfers until they received the Connolly documents in February of 2006. I think a couple of things that are really important with regards to this. First of all is the issue that the cause of action against Margaret Laughlin, Clinton Holland, and Hartford Holding Corporation, which was created on July 19th of 2001, even though they learn about it later and file that action, is a different cause of action than the ones against the defendant lawyers in this case. Because the cause of action doesn't become a cause of action against these people until they're recipients of money. Now, they become recipients of money in August of 2001 for the first time. And, of course, they continue to receive money all the way up through 2006, according to what we've seen. So that's when the cause of action against them first becomes potentially viable. But to then have a viable cause of action, we – Can we just stop to try to make sure we understand? One of the amounts of money that flowed through was $60,000, right? That's correct. And when did that occur? That occurred on August 2nd of 2001. Okay. And the correspondence on that is in 2003, correct? I'm sorry. The correspondence is sort of saying, do you have any of our money? Oh, yes. But that doesn't relate to that's – that's when that $60,000 gets disclosed. And they do learn about the $60,000 or $50,000. Now, the $200,000. They never learn about it until – And when did that – when was that transferred? That was transferred on August 1st of 2001. So, again, a look at the bank records in 2003 would have revealed that information. Potentially, if they could have gotten those. Well, you know, maybe I spent too many years doing commercial litigation, but it's rare you can't get the bank records. I can't tell you what happened. I don't – the record does not help us with why that problem exists. It just doesn't help us. What does help us with regards to this case is that they focus only on these defendants in 2003 because they have a lulling document. Now, that lulling document, that $29 million, clearly doesn't have anything to do with the $10 million. It's supposed to be a source from which they're going to be paid back money because $20 million is substantially larger. What is the lulling document you're referring to? The lulling document is the – it's the $29 million wire transfer that bears the Campbell-Warburton – it's found at page 114 of the record. That's the lulling document. And it's – it purports to have $29 million, which is substantially, of course, greater than $10 million, transferred into the control of the defendants for the purposes then of paying back the plaintiffs in this case. That's the lulling document. That's the letter that creates John Tulek, the lawyer who filed the action against the original thieves, to write letters to Kelley Law Firm. And he writes letters to Kelley Law Firm, and in response, what he gets is letters back from her, the final letter of which contains essentially false statements, which are believed. Now, lawyers are people in our society who are supposed to be believed. There's no fiduciary relationship, right? There's no fiduciary relationship. He's not under oath. He's not under oath. And there's no discovery taken of the law firm or third parties? The first time they try to take discovery of the law firm is in August of 2006. And at that point, the law firm says no. But at this point in time – What's the false statement in the – in her response? There are two false statements in this. And all of it takes place in the last paragraph, where she says, I reiterate my discomfort in your continued inquiry into my client's financial affairs. No one is playing games here. We know from later documents that's not true. However, personal inquiries are – personal financial inquiries are not something to take lightly. There is nothing else to report. Okay. That's an answer to the letter that was sent to her, where it says, I must again ask you whether the firm has received any amount. So they're asking about the firm. And she could have just said, this is what the firm got. But she goes on to say there's nothing else. There is nothing else going on here. And we know – Well – And the question is – Why did she – the question then – on Round 1, they might have personally been asking about Cale personally. But on Round 2, it's clear that the inquiry is to the firm. She says, here's the situation. That's all there is, is to the firm. So why is that false? A reasonable jury, a jury – and we're saying that this should be presented to a jury. A jury looking at the case later would have the opportunity to look at those statements and then to try to determine her state of mind based upon what she says when it's finally uncovered, which is in the handwritten note that she wrote, which is found on page 113. And that one's really important because now they know. And when they find out, what does she say? She says, how did they know I received the money? How did they know that? And if you look at that document and, you know, which evidence? Me and firm received money. And then she tries to speculate. You know, I just think, again, it's not you. These people have had a series of lawyers that, for whatever reason, didn't seem to follow the normal course of things. And I know they sued Mr. Tulak. Is that right? There was a suit against Mr. Tulak. I don't know the results. But our position is that a jury could look at this letter and could look at what she said later that gives us her state of mind, and a reasonable jury may well decide that this is a false statement, not just that it's sufficiently misleading to be a false statement that creates concealment, so that under Bernson, we're allowed then to have a tolling. If the statute of limitations is told. If you were to can the statement either is or is not misleading. So my question is, how does the later discovered evidence and the additional handwriting, how would that affect whether or not as to the people deciding whether to file suit, this is misleading or not? Because in a case of, in a circumstance of fraud, one could say, well, that's just, you know, language she was using and it may have just been a mistake. It's intentional. And the later document shows us what her state of mind was and that she intended by writing this to mislead these individuals with regards to what had happened. If we told the statute of limitations as to these defendants, and we told it from this letter on June 5th of 2003 until they finally get the truth, and they get the truth in, on February 21st of 2006, if we take that period of time out and toll it, they're clearly within a 3-year statute of limitations, whatever date she used for the first date that starts. I notice I'm down to 2 minutes and I want to be able to save some time. So unless there's other questions, I'd like to hold. Thank you. Good morning. Could you speak up a bit for us? Thank you. Pardon me. Your Honor, Your Honors, first off, I'd like to point out that when Judge Fogel heard the motion for summary judgment in the district court, he accommodated the plaintiff at that time. And notwithstanding our objections to all the documents they submitted in opposition to our motion, he presumed them admissible and considered them anyway. And nevertheless, characterized what they presented as the factual basis for their argument, that does not amount to a coherent theory as to what actually occurred. And looking at these documents, Your Honors, there is no foundation provided for any of them virtually. And a good example is the reference this morning to a handwritten note by Kelly Loughran that says, how did they know I got the money? And that was related in an argument this morning to the letters with the exchange with Mr. Tulak. There's no connection there. Why would it be unusual for someone being accused of having received stolen money to ask how do they know I got money? There's no connection there. It's the same incoherent narrative that is being presented to this court that was found to be insufficient to identify any material, disputed material issue of fact. Now, Mr. Thacker, that's your analysis of it and the inferences that you make, and they're logical inferences. You make a very good argument. Could a jury come to a different conclusion, also making its own inferences? On this record, Your Honor, this evidence would never get to the jury. But in any event, I do not believe so. And to establish a disputed issue of material fact, it has to be credible. It has to be, but more importantly, it has to be admissible and competent evidence. And that was not before Judge Fogle. He as much as admitted as much, and then nevertheless considered it anyway and found that it just didn't make sense. Let me get that straight. You objected to the admissibility of Kelly's comment, that's all there is to report or there's nothing else to report. Now, are you contending that that letter was not admissible? Yes, Your Honor. And the judge, did he rule on it and say, I find it's not admissible? No, Your Honor. Judge Fogle's ruling was presuming, notwithstanding the objections, presuming all of the evidence as admissible, I nevertheless find it insufficient to establish a material issue. Okay. And is that the same situation with regard to the entry that she made, how did they know I got the money or something like that? Certainly, Your Honor. What was presented to the Court does not establish any foundation whatsoever for that statement. It doesn't establish why she made the statement, what the statement refers to. There's no evidence or reasonable inference that can be drawn from that isolated handwritten note to connect it with anything that was going on between Kelly Loughran and Mr. Tulak. In the ---- But this ---- I'm having some trouble understanding how the letter, the correspondence between your client and the inquiry about the firm's receipt of money, why that wouldn't be admissible? You're saying that your response to Judge Thompson was even that statement, there's nothing else to report, that that letter would not be admissible? No, Your Honor. I'm not ---- honestly, I don't remember whether I objected to the admissibility of that letter. But even if that letter comes in, that does not create a disputed issue of material fact. And I would like to point the Court to a passage in those letters that I think would clarify matters. First of all, Mr. Tulak's initial inquiry on May 16, 2003, says your, the first line, your firm's trust account has been identified as a possible location of funds. Your firm. It doesn't ask about Ms. Loughran's personal receipt of money from her mother. And then at the end, it says, if you do not respond, I must name you and the firm as defendants. So he's inquiring about the firm, but threatening litigation against both of them. Now, perhaps an ambiguity? I don't think so. But even if it was, Ms. Loughran, in responding on June 2, clarifies that. First, the second sentence of her letter, it says, it is my understanding you are local counsel for the New Amsterdam and are requesting information regarding any funds this firm may hold in trust for certain clients. And then in the last paragraph, well, in the second paragraph, she explains what the attorney-client relationships are. Last paragraph, she responds as to what money they did or did not receive. Mr. Tulak responds the same day, again, limiting his inquiry specifically to the firm. Second line, second sentence, your letter does not state whether the firm received any other amount. Second paragraph, therefore, I must ask whether the firm has received any amount. To which she responded for three days later, explaining what the firm had received. And in each of her responses, she carefully alerted Mr. Tulak that she was concerned about the existence of the attorney-client relationship and the attorney-client privilege. Now, with respect to the ---- Well, if she was worried about it, she didn't seem to be when she responded to his ---- she actually responded to his inquiry, right? She responded directly and truthfully and then explained her concern about the attorney-client privilege and relationship, which explains clearly why she would not have gone further. Does she have, as a member of the bar, does she have a duty of candor that would have required her to make a report in response to this inquiry? With respect to herself personally, if it's all kind of tied in together here. When you say make a report, you mean respond to Mr. Tulak? I mean, it is a little unusual. I mean, it's the kind of thing where you say, you know, are you wearing a robe? No, I'm not wearing a bathrobe. Oh, okay, well, then you've answered responsibly. I'm wearing a robe. So it's like this attorney, she's slicing it about as thin as you could slice it here. So my question is, does she have any kind of duty being an attorney that would distinguish her situation from, say, just an average citizen if they wrote out a letter like that? Perhaps, Your Honor, but I do not believe that it would change or impose any duty to ---- on Kelly to respond beyond what she did. As I attempted to point out in this exchange of letters, it's very clear that the focus of the inquiry was the firm. To the extent the first letter may have been ambiguous, and I don't believe it was because the first sentence refers to the firm, her second ---- her first response, Mr. Tulak's second inquiry, and Kelly's second response clearly have focused on the firm. Now, Ms. Loughran, Kelly Loughran, is not dealing with a member of the public as such. She's dealing with an attorney in an adversarial context. He has been retained to investigate and recover $10 million. He has written a letter initially saying, I think your firm has received money, and I'm going to sue you if you don't tell me everything I want to know. Mr. Mooney made the point that she didn't just say the firm doesn't have any more money. If she had stopped there, if she had stopped there, that would have been one thing. Mr. Mooney's point was she went on to say they don't have any money, plus no one's playing games, there was nothing else to report. What do you say about that? The focus of the letters at that point had clearly been on the firm. There was nothing else to report with respect to the firm. We're not playing games with respect to your inquiry about the firm. Mr. Tulak never said, and oh, by the way, what about you personally? Kelly responded saying, I understand you're asking about the firm, and here's the information. And Mr. Tulak did not say, no, I'm not just asking about the firm. I'm asking about anything. Now, with respect to what Mr. Tulak thought, intended or knew, we don't know because we never, no evidence of what Mr. Tulak, from Mr. Tulak was ever submitted to the court. We have only his letter. But we do know this. Mr. Tulak was certainly not deterred in his conviction that at least the firm and probably Kelly had received money that he thought belonged to his client because  However, it appears that less than nine months later, after the exchange of letters, Mr. Tulak signed a rule 26 disclosure that is at page 324. On page 318, Mr. Tulak, in his rule 26 disclosure nine months after the exchange with Kelly, identifies both Kelly and the firm as witnesses, and the subject of their testimony is receipt of a portion of the investment amount. Certainly under rule 11, his signing of that submission would indicate he had a good faith belief in what he was saying in there, and so clearly that is probably the best evidence we have since we don't have anything from him directly, that this exchange of letters had no bearing on his believing that the money had not been received by the firm or by Kelly. It had no effect on at all in deterring him from his convictions. And on that basis, as the Court pointed out early on, they knew everything they needed to know in 2003, and Mr. Tulak's letters confirm that. And the rule 26 disclosure confirms that he continued to believe that afterwards. And after all, a conversion cause of action is not that complicated. All they need to do is to go back and look at the records and see if there is anything that the plaintiff had in there that the plaintiff, without the plaintiff's consent, they had all those elements right there. Is there anything in the record on this point about whether the bank records were sought during this period and they were unable to get them, or is the record just silent on that point? The record is silent with respect to any submission by the appellant or the plaintiff as to what they did to pursue a diligent investigation and discovery efforts. I am not aware of any effort to subpoena bank records until I believe it was two years into this case. And I'll tell the Court it was because for two years I told them, subpoena our bank records so you can find out what the defendant's true involvement is. It was never done. Interestingly, U.S. Bank, they knew the name of the bank, they knew the bank account numbers to which they wired the $10 million. They had all that information. They never subpoenaed U.S. Bank. Had they subpoenaed the bank, there would have been a wire transfer in, there were wire transfers out as the Connolly documents seemed to establish. There was a record there. The bank had the records. And this was in 1903. Excuse me. I'm sorry. Was any of the money recovered? To my knowledge, no. None of it? Certainly not from us. Other than in settlement? Pardon? Other than via settlements with what, Connolly and Tulak? Potentially?  In a settlement context, as opposed to discovery when the action was commenced, motions to compel, presumably, to set aside under the crime fraud exception, Mr. Connolly's assertions of the attorney-client privilege. You know, on the issue of diligence, they prevailed on that in our action. They set aside the attorney-client privilege between my clients and Margaret Lockwood   And they set aside the attorney-client privilege, and the attorney-client privilege was set aside under the crime fraud exception. So there's really no reason to believe they couldn't have been equally successful had, in 2003, they pursued the issue diligently with Mr. Connolly, filed a motion to compel, arguing the crime fraud exception. Tell me again, Mr. Thacker, what is it you contend specifically they should have done in 2003 when they found this money was gone? They could have done two things. One is they could have sued. They could have initiated an action against the firm and Kelly Lockren. They didn't have any reason to believe at that time that she was involved at all. Well, Mr. Tulak wrote them a letter threatening to sue them both. Yeah, but maybe he would have had a little problem under Rule 11 if all he did was to say, do you have any money? So if we don't have any money, okay, I'm going to sue you. I mean, it's kind of between a rock and a hard place there on Rule 11. They could have sued Hartford and they could have sued Margaret, couldn't they? Or John Doe or John Doe. They named Margaret. They named others. They had enough under California law. They knew or they had a suspicion, at least a suspicion or cause to suspect an injury as a result of a wrongdoing. That starts the statute running. Now, they've argued that the district court's ruling puts them in an untenable position of filing a meritless lawsuit or something based strictly on a suspicion, but that's not true. The cause of action accrues and a three-year statute begins to run. From that point, they have three years to investigate their claims. If they didn't know or didn't feel comfortable naming Kelly, they had three years to investigate that, and a subpoena of the bank records would have certainly shown them everything they needed to know. In connection with the suit against Margaret, subpoena of the bank records? Certainly, Your Honor. That was the ongoing litigation and continued until at least 2006. So during that entire time, a lawsuit which they initiated in May of 2003, at any time, either discovery or subpoena in that litigation would have, I think, disclosed the record. And by the way, they have the burden to establish that they did, in fact, act diligently. And I submit that we haven't seen evidence of that in this case. Thank you, Mr. Thacker. Thank you. Mr. Meehan. Thank you. Quickly, jumping back to the foundation and admissibility and questions with regards to the evidence, we entered our appearance the same day that the defendants filed their motion for summary judgment in this. Discovery was right in the middle of work. Depositions were open. Lots were going on. We filed a 56-F motion at that point. The judge denied the 56-F motion and instead said, instead of going out and getting into that, I'm going to accept the basis for all this evidence. So for the purposes of being here, it would not be fair to look at credibility or foundation or anything like that. These documents were accepted below, and we would have to have the opportunity to go back and complete discovery if they were going, if that was going to be an important factor in what we're doing. You know, a big thing was made about the disclosures and the Rule 26. We would be happy to use the date of the Rule 26 as the inquiry date. That's March 12th of 2004. If March 12th of 2004 would be the date from which we started counting the three years, this case would have clearly been filed within the statute of limitations. There would have been no question at that point. And it's also important, I think, to look. He says, well, Mr. Tulek said I'm going to sue you and I'm going to sue your law firm. But look what he says he's going to sue them for. He doesn't say I'm going to sue you because I think you got some of our clients' money. He says we might have to sue you for an accounting and constructive trust. They're never in a position where they believe that the appellants or the defendants in this case had done anything wrong at that point in time. They had no reason to believe that. It's been well hidden, and these folks are absolutely successful in continuing to hide it. Does a lawyer have a duty of candor? We believe that they do. And we believe that the O'Hagan case, if nothing else, stands for the principle that they do. And if a lawyer begins – a lawyer could stop, could not speak. She could have said, I'm sorry, I can't tell you anything, or I'm not going to talk to you. But once you start to talk, because of the position that we hold in the community, we're expected to be truthful and we're expected to have candor, and we're not expected to   And so we believe that a lawyer should be able to look at intentional misleading actions and a jury should be able to look at that to decide whether or not that's the case. Thank you, Mr. Moody. Mr. Thacker, thank you. The case just started. I think I saw something fly out. There you go.
judges: Thompson, Silverman, McKeown